UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EDDIE SANTIBANES, | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | CIVIL ACTION NO. H-07-1804 |
| | § | |
| CITY OF TOMBALL, TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I.     INTRODUCTION

Before the Court is the defendants', Sergeant Jeffrey Williams and the City of Tomball, motion for summary judgment and memoranda in support thereof pursuant to Federal Rule of Civil Procedure 56 (Docket Entry Nos. 30, 31 and 32).[1]  The plaintiff has filed a response (Docket Entry No. 48) and the defendants have filed a reply (Docket Entry No. 53).  After having carefully considered the pleadings, the parties' submissions, the uncontested facts and the applicable law, the Court determines that the City of Tomball's motion for summary judgment should be GRANTED in part and DENIED in part.

### II.     FACTUAL BACKGROUND

Sergeant Williams is a police officer employed by the City of Tomball ("the City").  In the late afternoon hours of March 31, 2006, while on duty in an area near Highway 249, he was alerted, via police dispatch, to be on the lookout for a green, short-

---

[1] On June 8, 2009, the plaintiffs filed an Unopposed Stipulation of Dismissal of Claims Against Sergeant Williams.  On June 10, 2009, the Court entered an Order granting the plaintiff's Stipulation of Dismissal and dismissing all claims against Sergeant Williams with prejudice.  Thus, the Sergeant Williams' motion for summary judgment is hereby denied as moot.

wheel base, GMC model truck with dark-tinted windows that had recently been reported as stolen. The dispatcher provided the location and time of the theft, as well as the truck's license plate number. Responding, Sergeant Williams positioned his marked patrol vehicle along Highway 249 to observe passing vehicles. After several minutes, he spotted a vehicle traveling southbound matching the description of the stolen truck. Sergeant Williams proceeded onto the thoroughfare, and positioned himself some distance behind the truck. He confirmed that the truck's license plate number matched that of the stolen truck. He did not activate his emergency overhead lights at this time. Instead, he proceeded to follow as the truck turned onto Boudreaux Drive. Sergeant Williams alleges that by this time, he could observe two occupants in the truck. He also asserts that the occupants engaged in furtive movements, suggesting to him that they were indeed aware of his presence. Once on Boudreaux Drive, he activated his patrol vehicle's dashboard video camera.

As Sergeant Williams continued to follow, the truck turned left onto Berry Hill Drive. At this point, Sergeant Williams activated his overhead lights. The truck slowed in response and proceeded toward the right shoulder of the roadway. As the truck came to a complete stop, Sergeant Williams hurriedly maneuvered his patrol vehicle to a position near parallel to the driver side of the truck. In the course of making this move, and before his own patrol vehicle had come to a complete stop, Sergeant Williams had upholstered his weapon and pointed it in the direction of the truck's occupants. Immediately after commanding one or both of the occupants to "get your hands up," a single round discharged from his weapon, shattering the patrol vehicle's passenger side window, and striking the plaintiff, who was a passenger in the truck. Police backup units

had not yet arrived, as approximately ten seconds had elapsed from the time the vehicles turned onto Berry Hill Drive and the time of the shooting.   Sergeant Williams immediately reported the shooting and requested Emergency Medical Technicians and Paramedics.   He then proceeded to take the driver into custody.   As a result of the discharge from Sergeant Williams' weapon, the plaintiff sustained a non-fatal gun shot injury to his head.

On May 31, 2007, the plaintiff commenced the instant action against the City and Sergeant Williams in his individual and official capacities, under 42 U.S.C. § 1983,[2] alleging constitutional violations of his Fourth, Fifth, Eighth, and Fourteenth Amendment rights.   In the alternative, he alleges a state law claim for assault against Sergeant Williams as well as a claim for negligence against the City pursuant to the Texas Tort Claims Act.   On March 31, 2008, the City and Sergeant Williams moved for summary judgment on the plaintiff's claims, premised in part, on Sergeant Williams' claims of qualified and official immunity.   On May 20, 2008, the Court issued an Order reserving ruling on the defendants' motion for summary judgment in light of the looming trial.

On May 28, 2008, Sergeant Williams filed a Notice of Interlocutory Appeal.   On June 19, 2008, he filed his Notice of Appeal.   On June 8, 2009, the plaintiffs filed an Unopposed Stipulation of Dismissal of Claims Against Sergeant Williams.   On June 10, 2009, the Court entered an Order granting the plaintiff's Unopposed Stipulation of Dismissal and dismissing all claims against Sergeant Williams with prejudice.   On June

---

[2] Section 1983 provides that "every person who, under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."   42 U.S.C. § 1983.   By its terms, the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere.   *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).

26, 2009, Sergeant Williams filed his Unopposed Motion to Dismiss in the United States Court of Appeals for the Fifth Circuit, seeking dismissal of his appeal as moot. On July 8, 2009, the Fifth Circuit filed an order granting Sergeant Williams' unopposed motion to dismiss. Notwithstanding the aforementioned, the City's motion for summary judgment remains pending.

## III.   CONTENTIONS OF THE PARTIES

### A.   The City's Contentions

The City essentially contends that summary judgment on the plaintiff's section 1983 claim is appropriate because the plaintiff has failed to show a deprivation of a constitutional right. This conclusion depends largely on its contention that the shooting was the result of an accident rather than the byproduct of an intentional act. It also argues that even if the plaintiff were to succeed in properly alleging a violation, Sergeant Williams' actions were objectively reasonable under the circumstances. The City further asserts that even if the plaintiff were to succeed in properly alleging a violation, the acts or omissions made the basis of this litigation were not the result of or in accordance with a practice, custom, or policy of the City. Finally, with respect to the plaintiff's negligence cause of action, the City avers that the claim does not fall within a category of claims for which sovereign immunity has been waived under the Texas Tort Claims Act. As such, the City contends that sovereign immunity protects it from liability for such a claim.

### B.   The Plaintiff's Contentions

The plaintiff contends that a genuine issue of material fact exists as to whether a constitutional deprivation has occurred. The plaintiff also contends that in light of the

lingering fact issue and when viewing the evidence in the light most favorable to him, Sergeant Williams' actions were objectively unreasonable.  The plaintiff further avers that Sergeant Williams acted unreasonable or omitted to act as a result of and in accordance with the City's practice, custom, or policy.  As such, he asserts that municipal liability attaches and the City should be held liable for the unconstitutional acts of Sergeant Williams, its employee.  Finally, the plaintiff argues that the Texas Tort Claims Act does not act to bar his state law negligence claim against the City.

## IV.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "The [movant] bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact."  *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex v. Catrett*, 477 U.S. 317, 322-325 (1986)).  Once the movant carries this initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate.  *See Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).  The nonmovant must go beyond the pleadings and designate specific facts proving that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmovant may not rest on conclusory allegations or denials in its pleadings that are unsupported by specific facts.  FED. R. CIV. P. 56(e).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists."  *Lynch*, 140 F.3d at 625.  "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party."  *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).  Thus, "[t]he appropriate inquiry is 'whether the evidence represents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251-252).

## V.    ANALYSIS & DISCUSSION

### A.    The Plaintiff's Claims Under the Fourth Amendment

#### 1.    Step One: the Plaintiff's Allegation of a Fourth Amendment Violation

The plaintiff contends that:  (1) he was unlawfully seized; and (2) the use of deadly force to produce such seizure was excessive to the need.  The City contends that Santibanes was not deprived of any constitutionally protected right because his injury was the result of an accident, not unconstitutional conduct.  Additionally, it argues that Sergeant Williams' actions were objectively reasonable under the circumstances because he had probable cause to believe that the truck occupied by the plaintiff was stolen.  It further contends that the plaintiff cannot satisfy the elements of an excessive force claim under the Fourth Amendment because Sergeant Williams' actions were the result of an unfortunate accident, rather than a byproduct of intentional conduct.

At the outset, the Court finds that Sergeant Williams had probable cause to believe that the truck occupied by the plaintiff was stolen.  The record indicates that he was alerted via police dispatch to be on the lookout for a green, short-wheel base, GMC model truck with dark-tinted windows that had recently been reported as stolen.  Sergeant Williams spotted a truck traveling in the vicinity matching this description.  He confirmed that the license plate number indeed matched that of the stolen truck. Accordingly, the Court finds that Sergeant Williams had legal authority to stop the truck and detain its passengers.

To bring a section 1983 excessive force claim under the Fourth Amendment,[3] however, a plaintiff must first show that he was "seized."  *See Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  Next, he must demonstrate that:  (1) he suffered an injury; (2) such injury resulted directly and only from the use of force that was excessive to the need; and (3) such force was objectively unreasonable. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000).

The City contends that the plaintiff cannot show that he was "seized" within the meaning of the Fourth Amendment because only intentional conduct may cause a seizure.[4]  In its view, the record in this regard clearly shows that Sergeant Williams' weapon discharged as a result of an accident.

---

[3] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.

[4] It is important to note that at least one circuit has proceeded to analyze a purely accidental shooting by police officers under the Fourth Amendment's reasonableness standard.  *E.g., Pleasant v. Zamieski*, 895 F.2d 272 (6th Cir. 1990), *cert. denied*, 498 U.S. 851 (1990).

### a.    Fact Issues Exist as to an Intentional Shooting[5]

A "seizure" triggering the Fourth Amendment occurs whenever government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  Where government seeks to restrain one's liberty by show of authority, a "seizure" does not occur unless the suspect also yields to this assertion.  *California v. Hodari D*., 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) ("An arrest requires *either* physical force … *or*, where that is absent, *submission* to the assertion of authority") (emphasis in original).  Additionally, and particularly pertinent to the inquiry at bar, only intentional conduct of government actors invokes the protections of the Fourth Amendment.  *Brower v. County of Inyo*, 489 U.S. 593, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989).

In *Brower*, police employed a "blind" roadblock – a tractor trailer parked across a highway just around a bend – to stop a fleeing car thief.  The suspect collided with the trailer at a high rate of speed and was killed.  Finding that the suspect had been "seized" within the meaning of the Fourth Amendment, the Court stated that "violation of the Fourth Amendment requires an intentional acquisition of physical control" and that a seizure occurs "only when there is a governmental termination of movement *through means intentionally applied*." *Id*. at 596 (emphasis in original).  The Court also observed that the Fourth Amendment "addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful conduct." *Id*.  The Court found it sufficient, however, that the

---

[5] The plaintiff has filed three specific objections to the defendants' summary judgment evidence.  Because the Court's determination does not turn on this evidence, the plaintiff's motion to strike this evidence, or portions thereof, is DENIED as moot.

roadblock which produced the stop was intentionally designed to do just that if the suspect chose not to yield on his own accord.

While *Brower* dealt with a very different set of facts, its holding makes clear that accidental or unintentional conduct on the part of government actors, such as police officers, does not give rise to a violation under the Fourth Amendment.  For example, in *Campbell v. White*, 916 F.2d 421 (7th Cir. 1990), the Seventh Circuit rejected an argument that a state trooper's accidental collision with a motorcyclist amounted to a "seizure."   Relying on *Brower*, the court made a distinction between the trooper's intentional actions in pursuing the suspect for the purpose of apprehending him and the trooper's accidental conduct in running into him:

> [T]here is no evidence whatsoever to suggest that [the trooper] intended physically to stop or detain [the suspect] by running over him with his car in the event [the suspect] refused to pull over voluntarily.  The collision between [the trooper] and [the suspect] was not '*the means intentionally applied*' to effect the stop, but was rather an unfortunate and regrettable accident.

*Id*. at 423 (emphasis in original).  The same result logically applies in the context of accidental shootings.  For example, in *Landol-Rivera v. Cruz Cosmo*, 906 F.2d 791 (1st Cir. 1990), the plaintiff was accidentally shot by police during an attempt to apprehend a suspect who had taken the plaintiff hostage.   The plaintiff alleged that he had been "seized" by police as a result of having been shot.   Relying upon *Brower*'s intent language, the First Circuit rejected this argument, stating that:

> A police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern.

*Id.* at 791; *accord Kalimah v. City of Mckinney*, 213 F. Supp. 2d 698 (E.D. Tex. 2002) (denying summary judgment where fact issue existed as to whether officer intentionally shot deceased); *Owl v. Robertson*, 79 F. Supp. 2d 1104, 1114 (D. Neb. 2000) ("if [a] shooting [is] truly accidental, then there [is] no violation of . . . Fourth Amendment rights"); *Troublefield v. City of Harrisburg*, 789 F. Supp. 160, 166 (M.D. Pa. 1992) (because "[the plaintiff] was injured by a bullet fired by accident, no [F]ourth [A]mendment rights have been trampled upon because [the officer] did not intend the bullet to bring plaintiff within his control"). If, in fact, Sergeant Williams accidentally fired his weapon – meaning that if he truly did not intend by means of his weapon to restrain the plaintiff – then no seizure has occurred, and the plaintiff's Fourth Amendment claim fails.

In this regard, the City contends that the summary judgment evidence undeniably establishes that the shooting was an accident. In support, it points to Sergeant Williams' account of what transpired – that he accidentally fired his weapon while simultaneously attempting to exit his patrol vehicle and maintain cover. It also points to several investigations which pin no fault on Sergeant Williams. Specifically, the Harris County Sherriff's Department, in cooperation with the Harris County District Attorney's Police Integrity Unit, conducted an investigation and presented its findings to a Harris County grand jury which no-billed Sergeant Williams.[6] The Tomball Police Department also conducted a concurrent internal investigation.[7] It concluded that Sergeant Williams acted

---

[6] It is unclear whether this investigation reached a conclusion as to whether Sergeant Williams acted properly. The record only suggests that its findings were forwarded to the Harris County District Attorney's office for grand jury review.

[7] The Tomball Police Department's internal investigation was conducted by Sergeant Gary Hammond.

properly and that no evidence suggested that he intentionally fired his weapon.   The defendants' expert, Albert Rodriguez, reached the same conclusion.[8]  Rodriguez surmises that Sergeant Williams' weapon discharged as a result of an involuntary contraction of the arm or hand muscles.

Despite these findings, the Court finds sufficient evidence to create a factual controversy as to whether Sergeant Williams intentionally fired his weapon.  In reaching this conclusion, the Court first considers the actions which Sergeant Williams and the City do not dispute were intentional such as:   (1) the fact that Sergeant Williams maneuvered his patrol vehicle alongside the truck; (2) the fact that Sergeant Williams upholstered his weapon; and (3) the fact that Sergeant Williams pointed the weapon in the direction of the truck's occupants.  Next, there is no argument nor record support to suggest that Sergeant Williams' weapon malfunctioned or otherwise discharged as a result of some force other than that applied by him.  In fact, forensic testing found that the weapon functioned properly when tested and fired under controlled conditions.[9] Hence, the only logical explanation for its discharge is that Sergeant Williams applied force to its trigger mechanism.  This circumstance, alone, is sufficient to deny summary judgment.  *E.g., Sepulveda v. Hawn*, No. CV 01-5054, 2002 U.S. Dist. LEXIS 11362 (E.D. Cal. May 16, 2002) (denying summary judgment where there was no evidence that

---

[8] Presumably, Rodriquez did not view the dashboard video prior to reaching his opinion; the video is not included on the list of materials reviewed by him, as indicated in his report.  In line with this presumption is the observation that his report lacks mention or discussion of the contents of the video in comparison to Sergeant Williams' recollections.
[9] As part of the Harris County investigation, Richard K. Anderson of the Harris County Sheriff's Office Regional Firearms Identification Laboratory conducted a forensic laboratory examination of Sergeant Williams' weapon and ammunition cartridges.  He then recorded his findings in a report dated May 2, 2006.

police officer's weapon malfunctioned; observing that the only reasonable explanation for the discharge is that the police officer pulled the trigger).

In addition, the sequence of actions Sergeant Williams claims he took prior to the actual shooting was memorialized on at least three different occasions.  He first described what transpired during a taped walk-through interview conducted immediately following the incident by Detective Sidney Miller of the Harris County Homicide Division.[10]  He also prepared an incident report later that day.  Finally, he was deposed for purposes of the present litigation.  After careful review, the record reveals inconsistencies and/or unknowns in Sergeant Williams' recollection as to the sequence of his actions immediately preceding the shooting when compared with the events captured on his dashboard video.  For example, Sergeant Williams stated on each occasion that he upholstered his weapon only *after* his patrol vehicle had come to a complete stop, and only *after* he had placed his patrol vehicle in park.  However, the video clearly shows that his weapon discharged *before* his patrol vehicle had come to a complete stop.  A logical inference is that Sergeant Williams had, in fact, upholstered his weapon and pointed it in the direction of the truck's occupants *before* his patrol vehicle had come to a complete stop, and logically *before* he had placed his vehicle in park.  Hence, Sergeant Williams' recollection in this regard is inaccurate.  He acknowledged this implausibility during his deposition after viewing the video, responding that the events occurred rather simultaneously.

Next, Sergeant Williams recalls that his weapon discharged only after placing his left hand on the steering wheel and only after his left foot was on the ground in the course

---

[10] Sergeant Williams also provided a written voluntary statement.  The substance of his statement mirrors the information he provided in the walk-through interview.

of his attempt to exit his patrol vehicle.  However, as noted, the video clearly shows that his weapon discharged before his patrol vehicle had come to a complete stop.  Hence, it is questionable whether Sergeant Williams had placed his patrol vehicle in park, removed his seatbelt, opened his door, and placed his left foot on the ground before his weapon discharged.  His ability to perform these tasks within a split-second period of time is questionable indeed.

Further, during the walk-through interview, and again in his incident report, Sergeant Williams stated that he pulled alongside the truck to prevent, or at least discourage, the suspects from fleeing on foot.  However, during his deposition, he stated for the first time that he also performed this maneuver to avoid colliding with the rear of the truck.  Finally, Sergeant Williams could not recall how or with which hand he placed his patrol vehicle in park.  And, despite recalling that he initially indexed[11] his weapon prior to its discharge, he could not recall how he came to apply force on the trigger mechanism.  In fact, according to Sergeant Williams, he was trained--and now trains fellow police officers--to index a weapon if not intending to fire it.  While his version of the facts may have been influenced by the speed at which the incident occurred, as well as the tension and threat that ordinarily accompanies his line of work, the inconsistencies and/or unknowns that have been revealed show, at the very least, that the sequence of his actions immediately preceding the shooting are internally inconsistent.  These actions, although somewhat inconsistent, bear some relevancy as to whether the shooting was indeed an unintended accident.

---

[11] Indexing is a term used to describe a manner in which a firearm is held.  It involves holding the firearm in the usual manner, except that the trigger finger rests outside the trigger guard and horizontal alongside the firearm.

Finally, the Court takes note of the modification to Sergeant Williams' weapon. In particular, he initially stated that his weapon – a Glock brand 21, .45 caliber pistol – had not been modified. However, after forensic testing and inspection, it was revealed that the weapon had, in fact, been modified in three separate respects. The relevant modification was to the weapon's trigger connector.[12] The record also shows that Sergeant Williams, prior to the incident, replaced the pistol's 5 pound trigger connector with a Glock 3.5 pound trigger connector. Forensic testing determined that this modification reduced the force needed to pull the trigger to approximately 4.5 pounds, making it easier to fire the weapon. In light of these considerations, whether Sergeant Williams, in fact, intended to discharge his weapon is an issue that cannot and should not be resolved at the summary judgment stage.

### b.        Evidence that the Plaintiff Was Seized?

Notwithstanding the existence of this fact controversy, the plaintiff contends that he had been "seized" even before the bullet struck him. Specifically, he contends that the driver of the stolen truck, before responding to Sergeant Williams' command to stop, but in response to his flashing lights, began to slow and proceed to the shoulder of the roadway. According to the plaintiff, this response alone amounts to a "seizure" because it demonstrates submission to a show of authority. *See Hodari D.*, 499 U.S. at 626 ("An arrest requires *either* physical force … *or*, where that is absent, *submission* to the assertion of authority") (emphasis in original). In the plaintiff's view, any action taken from that moment forward is subject to scrutiny under the Fourth Amendment's

---

[12] The recoil rod and spring assembly had also been replaced with an after-market recoil rod and spring assembly. In addition, the slide stop had been replaced with a Glock extended slide stop. According to Bob Radecki, the Glock representative who examined the weapon for Anderson, neither of these replacements should have altered the functioning of the firearm or the functioning of the trigger.

"reasonableness" standard.  For purposes of this inquiry, the Court must assume that Sergeant Williams fired his weapon as a result of an unintended, accidental act; for if the act were intentional, this inquiry is moot.  In light of this assumption, and considering a number of additional circumstances, the Court rejects this contention.

The court in *Troublefield v. City of Harrisburg*, 789 F. Supp. 160 (M.D. Pa. 1992), was presented with a contention similar to the one at bar.  There, a police officer responding to a car theft approached a suspect with his pistol drawn and ordered him to the ground.  With his pistol still drawn, the officer began to search the suspect, and then proceeded to apply handcuffs.  In the course of securing the handcuffs, the officer started to return his weapon to his holster when, suddenly, the weapon accidentally fired, striking the suspect.  The suspect-plaintiff brought suit under section 1983, alleging, *inter alia*, a violation of his Fourth Amendment right against unreasonable seizures.

The court acknowledged that the plaintiff had been "seized" prior to the shooting because, in a sense, his freedom of movement was restricted by application of handcuffs on his person.  Nevertheless, the court went on to hold that the Fourth Amendment did not apply.  In reaching its conclusion, the court relied upon *Brower*'s mandate that some nature of volitional act on the part of the state actor must cause the harm alleged by the plaintiff in order for a Fourth Amendment excessive force claim to sound.  Because "[the plaintiff] was injured by a bullet fired by accident, no [F]ourth [A]mendment rights have been trampled upon because [the officer] did not intend the bullet to bring [the plaintiff] within his control." *Id*. at 166.

The same logic applies here.  The plaintiff urges, and the Court assumes, that the driver of the stolen truck had sufficiently acquiesced to the display of flashing lights prior

to the shooting.  Hence, as assumed, Sergeant Williams had effectively terminated the plaintiff's freedom of movement through means intentionally applied – commanding a stop through use of flashing lights.  However, much like the plaintiff in *Troublefield*, the plaintiff here was injured by a bullet fired by accident.  Because Sergeant Williams did not intend the bullet to bring the plaintiff within his control, no Fourth Amendment right has been violated.  Accordingly, on this logic, the plaintiff cannot maintain an excessive force claim when the injury sustained was not caused by the means intended to produce the stop.

In addition, a negligible period of time – less than ten seconds – elapsed from the time Sergeant Williams first activated his lights until the time his weapon discharged.  The Court is of the opinion that his efforts to produce a stop – whether through intentional or unintentional efforts – were performed in one swooping and uninterrupted motion, making it impractical and unrealistic for the Court to pause every third second to determine whether, at that moment, a seizure had occurred.  Indeed, the speed at which the entire incident occurred left very little time for the suspects to reflect on and respond in full to Sergeant Williams' initial command to stop.

Based in part on this reason, the Court also finds that the driver had not fully acquiesced in response to Sergeant Williams' flashing lights.  While there is some indication that he may have been willing to fully surrender – as might be inferred by his act of slowing down and proceeding to the shoulder of the roadway – the truck had not come to a complete stop for any appreciable amount of time before the shooting occurred.  In addition, in his signed statement to the police, the driver of the stolen truck reveals that he, and perhaps the plaintiff as well, had no intention of acquiescing.  He

indicates, rather, that they had discussed fleeing on foot to escape capture, and that he at least planned to do so as both were familiar with the area.  He also indicates that the plaintiff was poised to follow suit, as the plaintiff had begun to place personal items in his pocket in anticipation of flight.[13]  For these reasons, the Court finds that the plaintiff had not been "seized" for any appreciable moment of time before the shooting occurred.

**2.      Step Two: the Reasonableness of Sergeant Williams' Actions**

Having found a fact issue as to the alleged Fourth Amendment violation, and viewing the facts in the light most favorable to the plaintiff, the Court next considers whether Sergeant Williams' actions were objectively reasonable.  Whether force used by law enforcement is unreasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *See Graham*, 490 U.S. at 396.

The facts, as alleged by the plaintiff, suggests that neither he nor the driver of the truck was armed or otherwise dangerous.  Nor is there any evidence that they had engaged in any sudden or suspicious activity that would suggest to Sergeant Williams that they posed an immediate and imminent danger to him or others.  The plaintiff further alleges that the truck's driver was in the course of pulling to the shoulder of the roadway in compliance with the command to do so when, without warning or provocation, Sergeant Williams intentionally fired a single shot into the truck causing serious bodily injury to the plaintiff.  These pleaded facts, when viewed in the light most favorable to the plaintiff, clearly violate the standard for reasonable seizures under the Fourth

---

[13] The plaintiff has no memory of the incident beyond the point at which they turned onto Berry Hill Drive.

Amendment.  *See Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (reasoning that a police officer may not seize an unarmed, non-dangerous suspect by shooting him to prevent flight).  Therefore, based on the summary judgment evidence, a genuine issue of material facts exists as to whether Sergeant Williams intentionally fired his weapon in light of the fact that deadly force was unjustified under the circumstances.

**B.      The Plaintiff's Claims Under the Fifth & Eighth Amendments**

The protections of the Eighth Amendment against cruel and unusual punishment are limited in scope to convicted prisoners and, therefore, do not apply to the plaintiff. *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996) (citing *Ingraham v. Wright*, 430 U.S. 651, 671, n. 40, 97 S. Ct. 1401, 1412, n. 40, 51 L. Ed. 2d 711 (1977)).  Similarly, the Fifth Amendment's "due process" guarantee applies only to the action of the federal government, and not to the actions of individuals or of a municipal government as in the present case.  *Morin*, 77 F.3d at 120.  Therefore, the City's motion for summary judgment as to the plaintiff's § 1983 claim premised on violations of the Eighth and Fifth Amendments is GRANTED.

**C.      The Plaintiff's Claims Under the Fourteenth Amendment**

**1.      The Plaintiff's Claim of Excessive Force Under the Fourteenth Amendment**

The plaintiff does not clearly articulate a "due process" violation under the Fourteenth Amendment with respect to the shooting itself.  Nevertheless, the Court attempts to decipher the claim and determines that it, too, fails.  "The Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression."  *Collins v. City Harker Heights,*

*Tex.*, 503 U.S. 115, 126, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992) (internal quotation omitted).   Its substantive component "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Id.* at 125 (internal citations and quotations omitted).   However, it "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).   "[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (quoting *Collins*, 503 U.S. at 128).

A plaintiff may bring a substantive "due process" claim under the Fourteenth Amendment only if the claim alleged is not susceptible to proper analysis under a specific constitutional source.   *See Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998) (citing *Lewis*, 523 U.S. at 843); *see also Graham*, 490 U.S. at 395 ("where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that [a]mendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims"). Consequently, if the Fourth Amendment applies to the plaintiff's excessive force claim, then his substantive "due process" claim is precluded.   *See Petta*, 143 F.3d at 901.   As previously explained, this determination hinges on whether Sergeant Williams intentionally fired his weapon, a fact in dispute.   However, even if the shooting, as alleged, were indeed an accident, the plaintiff's substantive "due process" claim would fail because the conduct in question was not "so egregious, so outrageous, that it may

fairly be said to shock the contemporary conscience."  *Lewis*, 523 U.S. at 847.  This conclusion is driven largely by the Supreme Court's admonition that conscious-shocking conduct must satisfy a certain state-of-mind threshold.

In *Lewis*, the Court made clear that the U.S. Constitution does not impose liability for negligently inflicted harm.  *Id*. at 849.  "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  *Id*.  "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property."  *Id*. (emphasis in original) (internal citations and quotations omitted).  Thus, it can fairly be said, with few exceptions, that conscious-shocking conduct must be something more than negligence; it must be intentional or deliberate conduct.

Here, if Sergeant Williams intentionally fired his weapon, the Court may not entertain the plaintiff's Fourteenth Amendment "substantive due process" claim because the Fourth Amendment will appropriately apply.  *See Roe v. Tex. Dept. of Protective & Regulatory Servs.*, 299 F. 3d 395, 411 (5th Cir. 2002) (citing *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (plurality)).  On the other hand, if the shooting was the product of an accident, the substantive due process component of the Fourteenth Amendment also fails because the shooting does not rise to the level of intentional or deliberate conduct; rather, it creeps closer to negligent or perhaps reckless conduct.  And, as previously noted, conduct other than intended or deliberate conduct

may not support a substantive "due process" claim.  As a consequence, in either event, the plaintiff's substantive "due process" claim under the Fourteenth Amendment fails.

### 2. The Plaintiff's Claim of Failure to Provide Medical Care Under the Fourteenth Amendment

The plaintiff also contends that Sergeant Williams failed to provide medical care following the shooting.  By this, the plaintiff essentially claims that he was deprived of a pretrial detainee's constitutional right to medical care under the Fourteenth Amendment. *See Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996) (referring to a person shot and killed in his vehicle by a police officer as a pretrial detainee).  Liability in this regard attaches if a plaintiff can show that a government official acted with deliberate indifference to a substantial risk of serious medical harm and injuries resulted. *Id*.  Here, the plaintiff makes no specific factual assertions upon which his Fourteenth Amendment claim might rest other than a bare allegation that Sergeant Williams "offered no medical assistance nor life saving techniques" to the plaintiff.[14]

Nevertheless, deliberate indifference in the context of a claim of failure to provide reasonable medical care to a pretrial detainee means that:  (1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's response indicates that he subjectively intended that harm.  *Thompson v. Upshur County*, 245 F.3d 447, 458-459 (5th Cir. 2001).  Deliberate indifference, however, may not be inferred merely from a negligent, or even a grossly negligent, response to a substantial risk of serious harm.  *Id*. at 459.

---

[14] The plaintiff does not address this claim in his response.

Sergeant Williams was immediately aware that his weapon discharged.  Within seconds, he also became aware that the plaintiff had been struck.  It is certainly reasonable to infer that Sergeant Williams had knowledge, at that time, that a gun shot injury carries with it a substantial risk of serious harm if immediate medical care were not provided.  However, the plaintiff does not specify which acts or omissions, if any, form the bases of his dilatory claim.  Nor does the plaintiff identify an injury or condition that resulted from or was caused by a delay in medical care.  In other words, there is no evidence to suggest that delayed medical care worsened the plaintiff's injury or otherwise caused him additional harm.  Moreover, there is no evidence to suggest that Sergeant Williams subjectively intended further harm.  Rather, the record shows that he responded immediately by reporting the incident and by requesting EMT service.  He confirmed this request twice, and EMT arrived on the scene within several minutes.  Importantly, the plaintiff was successfully treated.  The plaintiff's section 1983 claim premised on a failure to provide medical care under the Fourteenth Amendment fails.

### D.      The Plaintiff's Claim for Municipal Liability Against the City

The plaintiff also seeks to hold the City, a governmental unit or municipality, responsible for Sergeant Williams' actions under a municipal liability theory, asserting that Sergeant Williams acted as a result of and in accordance with the City's practice, custom, or policy.  Generally, municipalities, such as the City, are not liable for the constitutional torts of their employees unless those employees act pursuant to an official action or approval.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 663 n. 7, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  "Isolated unconstitutional actions by municipal employees will almost never trigger liability."  *Piotrowski v. City of Houston*, 237 F.3d

567, 578 (citing *Bennett v. City of* Slidell, 728 F.2d 762, 768 n.3 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016, 105 S. Ct. 3476, 87 L.Ed.2d 612 (1985)) (other citations omitted). In order to assert a claim for municipal liability under § 1983, a plaintiff must establish proof of three elements: (1) a policymaker; (2) an official policy or custom; and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Piotrowski*, 237 at 578 (citing *Monell*, 436 U.S. at 694, 98 S. Ct. at 2037).

1.   **The Plaintiff's Claim Regarding the City's Policy of Turning a Blind Eye to Unconstitutional Conduct**

a.   **Chief Blake as the Policymaker**

The plaintiff identifies Chief Michael Blake, who during all relevant times was the Chief of Police of the City, as the principal policymaker for the Police Department. The City does not dispute this contention outright; it merely points out that it is governed under the Council-Manager form of government and that all powers of the City are vested in an elective Council that enacts local legislation, adopts budgets, determines city policy and appoints a City Manager.  The City Manager is the administrative and executive officer of the City, whose responsibility includes the execution of laws and the administration of the City government.  The Chief of Police is the senior officer of the Police Department, and is appointed by the City Manager, with the approval of City Counsel.  He is generally responsible for the administration of the Police Department and the performance of Council-established duties and directives.  In this capacity, there is little doubt that Chief Blake established and maintained policies and procedures within the Police Department.

Pursuant to City Council authority, the police department adopted a comprehensive Departmental Policy Manual to guide the City's police officers in

lawfully performing their duties.  Chief Blake indicates that he had a hand in creating this

manual.    In fact, he emphasized that he completely overhauled the policies and

procedures previously put in place by his predecessor, Chief Paul Michna.  This manual

is provided to every city police officer and each officer is required to be familiar with its

contents.  Moreover, Chapter 5 of the manual expressly grants the Chief of Police the

authority to create policy through written directives and other forms of communication.[15]

Hence, it is clear that Chief Blake, as Chief of Police, was a city policymaker during all

relevant times alleged in this suit.

### b.    The Official Policy

The plaintiff's next task is to identify an official municipal policy.  An official

policy is either:

> 1.  A policy statement, ordinance, regulation, or decision that
>     is officially adopted and promulgated by the municipality's
>     lawmaking officers or by an official to whom the
>     lawmakers have delegated policy-making authority; or
>
> 2.  A persistent, widespread practice of officials or employees,
>     which, although not authorized by officially adopted and
>     promulgated policy, is so common and well-settled as to
>     constitute a custom that fairly represents the municipal
>     policy.  Actual or constructive knowledge of such custom
>     must be attributable to the governing body of the
>     municipality or to an official to whom that body had
>     delegated policy-making authority.

*See Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc).  Under the

first definition, liability may occur in two circumstances.  First, liability may occur as a

---

[15] Sec. 58-35 of the City Charter provides that:  "[T]he Rules Manual of the police department, same being
attached to the ordinance from which this chapter is derived and incorporated by reference.  All rules,
regulations and standards of conduct set forth therein shall be strictly adhered to by all members of the
police department. (Code 1978, § 20-26)."  Hence, pursuant to City law, the City Council delegated final
policymaking authority to its Chief of Police as the senior officer of Police Department.  Delegating
policymaking authority carries an implied recognition that such policy is final.  *See Pembaur v. City of
Cincinnati*, 475 U.S. 469, 481-84, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) (holding that the authority to
make municipal policy is necessarily the authority to make final policy).

result of illegal or unconstitutional actions of the municipality's policymakers themselves, as they engage in, for example, the setting of goals and determining the manner in which goals will be achieved. Second, liability may also occur when the municipality's policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees. *See Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir. 1990). Without an official policy statement, and absent proof of a persistent, widespread practice of excessive use of force by city police officers, the plaintiff essentially relies on this latter circumstance. The alleged policy is that of turning a blind eye to the unconstitutional conduct of city police officers in using excessive force. The plaintiff contends that the existence of this policy may be inferred with proof that Chief Blake approved or otherwise ratified Sergeant Williams' actions. The City contends, however, that a single, isolated incident is insufficient to prove the existence of a municipal policy.

The plaintiff apparently seeks to rely on the "single incident" exception identified in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). In *Pembaur*, the Supreme Court held that municipal liability under section 1983 may attach out of isolated decisions or actions taken by municipal policymakers. *See id.*; *see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 406, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (quoting *Pembaur*, 475 U.S. at 481); *see also Milam v. City of San Antonio*, 113 Fed. Appx. 622, 626 (5th Cir. 2004) ("plaintiffs can hold municipalities liable for single instances of conduct perpetrated by the policymakers themselves; such one-time conduct can represent official 'policy' even though it does not necessarily form part of a plan or rule developed to govern all like occasions."); *Estate of Davis v. City of*

*N. Richland Hills*, 406 F.3d 375, 385-86 (5th Cir. 2003) (acknowledging a single incident exception).

In the wake of *Pembaur*, the Supreme Court had opportunity to further define the contours of this exception in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). There, a plurality opinion[16] described a situation in which a municipality could be held liable based upon a single episode of conduct by a subordinate, non-policymaking employee if the conduct in question is ratified post-hoc by one who exercises final policymaking authority. *See Praprotnik*, 485 U.S. at 130. Relying on *Pembaur*'s admonition that a municipality may only be held liable for acts which the municipality itself has sanctioned or ordered, the plurality opinion explained that:

> If a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker[,] . . . the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official.

*Id*. It also explained that:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Id*. at 127. On various occasions since *Praprotnik*, and on at least one occasion pre-dating the case, the Fifth Circuit has either recognized or indicated that it would give

---

[16] Justice O'Connor announced the judgment of the Court and delivered an opinion, in which Chief Justice Rehnquist, Justice White, and Justice Scalia joined. Justice Brennan filed an opinion concurring in the judgment, in which Justice Marshall and Justice Blackmun joined. Justice Stevens filed a dissenting opinion. Justice Kennedy took no part in the decision.

favorable treatment to this so-called "ratification" theory. *E.g., Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 603 (5th Cir. 2001); *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 225 (5th Cir. 1999); Turner v. Upton County, 915 F.2d 133, 136 (5th Cir. 1990); *Chavez v. Brownsville Indep. Sch. Dist.*, 135 Fed. Appx. 664, 679 (5th Cir. 2005); *Milam v. City of San Antonio*, 113 Fed. Appx. 622, 626 (5th Cir. 2004); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) (affirmed municipal liability based on isolated instance of officers' use of excessive force because the sheriff's actions following the incident essentially ratified the officers' conduct); *see also Rivera v. City of San Antonio*, No. 06-CA-235, 2006 U.S. Dist. LEXIS 83376, at **34-38 (W.D. Tex. Nov. 15, 2006); *Ratliff v. City of Houston*, No. H-02-3809, 2005 U.S. Dist. LEXIS 39410, at **90-91 (S.D. Tex. Jul. 25, 2005); *but see Fraire v. Arlington*, 957 F.2d 1268, 1278-79 (5th Cir. 1992).

Chief Blake indicates that he reviewed the incident report and personally interviewed Sergeant Williams shortly after the incident. Additionally, he had the benefit of the information provided by the Harris County Sheriff's Department and the internal affairs office of the Tomball Police Department. Based on this information, as well as on his own factual understanding of the incident, Chief Blake found no fault in any of Sergeant Williams' actions, and concluded that he acted properly as any reasonable officer would do under the circumstances. In addition, Chief Blake also concluded that no credible evidence suggested that Sergeant Williams fired his weapon intentionally.

Viewing the evidence in the light most favorable to the plaintiff, as this Court must, Chief Blake's conclusions come notwithstanding Sergeant Williams' apparent

violations of the Tomball Police Department's policies and procedures.[17]  Particularly, Chapters 31 and 42 of the Tomball Police Department Policy Manual prohibit officers from firing their weapon from a vehicle in motion, or at a moving or fleeing vehicle, except in self-defense.[18]  Chapter 42 also limits the use of deadly force only to situations in which the officer reasonably believes that such force is immediately necessary to defend his/her life or the lives of others.[19]  Additionally, the plaintiff directs the Court to a policy statement, which prohibits all officers from pulling alongside vehicles being pursued.[20]  The Court also finds significance in the fact that Chief Blake, in reaching his conclusions, elected not to view the dashboard video, which places the plausibility of Sergeant Williams' version of the facts into question.[21]  Finally, Chief Blake was aware of the modification to the trigger component of Sergeant Williams' weapon as well as the fact that Sergeant Williams did not blame his weapon's discharge on a malfunction.  In light of these considerations, the Court finds sufficient evidence of a municipal policy.

---

[17] In his response, the plaintiff cites to several alleged policy statements found in the Departmental Policy Manual.  However, several of these statements are no where to be found in the chapters cited to.  As such, the Court does not consider them.

[18] Chapter 31, Police Vehicle Operation, provides in pertinent part that:  "An officer shall not shoot from a moving vehicle, or at a moving or fleeing vehicle, except as deemed immediately necessary in self-defense of an officer being fired upon by an armed suspect."  Chapter 42, Use of Force, provides in pertinent part that:  "Shots fired at or from a moving vehicle are generally ineffective and are not to be fired unless in the immediate emergency defense of a human life."

[19] Chapter 42 also provides in relevant part that:  "An officer may use deadly force only when: (1) He reasonably believes that the action is in defense of human life, including the officer's life. (2) In defense of any person in immediate danger of death or serious bodily injury.

[20] The City contends that this particular policy statement, #006, is outdated and has been superseded, as it was put in place by Former Chief of Police Paul Michna.  However, the City points to no source that might substantiate its contention; nor has it moved to strike the plaintiff's statement.

[21] On this point, the Court finds it significant that the filings of the Harris County investigation that appear in the record do not explore the plausibility of Sergeant Williams' recollection in light of the dashboard video.  The report of the internal investigation fails to explore this issue as well.  And, as previously observed, neither does the expert report issued by Albert Gonzalez.

c.        **The Moving Force**

The plaintiff has alleged that the City has a policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct of its police officers in using excessive force.  When the facts alleged are viewed in a light most favorable to the plaintiff, it is reasonable to infer that Sergeant Williams used deadly force with the knowledge that the City would exact no consequence for his actions.  This is sufficient to allege, at this stage of the proceedings, that the City's policy, as alleged, affirmatively caused – that is, was the "moving force" – behind the alleged constitutional violation. *See Grandstaff*, 767 F.2d at 170 (noting that if reckless disregard for human life by police officers is "attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights," and where police officers know that use of deadly force in conscious disregard to the rights and safety of others will meet with the approval of city policymakers, the moving force requirement is satisfied).

2.        **The Plaintiff's Claim that the City Is Liable Under § 1983 for Failure to Train, Supervise and Adopt Policies**

The plaintiff also contends that municipal liability attaches to the City because it failed to:  (1) train its employees, (2) supervise its employees, and (3) adopt policies to prevent the sort of constitutional deprivation that has become the subject of this litigation. While "[i]t is [true] that a municipality's policy of failing to train its police officers can give rise to § 1983 liability," such liability arises only where a plaintiff can prove a direct causal link between the municipality's policy and the alleged constitutional deprivation. *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) (citing *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 41 (1989)).  However, unlike

the plaintiff's ratification theory – where the alleged policy itself caused the deprivation of a constitutional right – liability under this theory requires a showing that the failure to train amounts to a "deliberate indifference" to the rights of others.  *Harris*, 489 U.S. at 388, 109 S. Ct. at 1204 - 05.  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions."  *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).  "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (citations omitted).  Demand for such a high standard of proof requires a showing of more than mere negligence or even gross negligence.  *See, e.g., Gonzalez v. Ysleta Indep. Sch. Dist*., 996 F.2d 745 (5th Cir. 1993) (holding that school board did not act with deliberate indifference when it failed to remove a teacher accused of fondling students; mere negligence falls short of the deliberate indifference standard).

     In this case, the plaintiff cites to various policies and procedures outlined in the Departmental Policy Manual, which on their face apply to the facts as alleged.  Next, he points out that, when these facts are viewed in a light most favorable to him, the evidence shows that Sergeant Williams failed to act in accordance with these identified policies and procedures, or as illustrated in his deposition, was completely unaware of them.  The plaintiff concludes, by way of inference, that such failures and/or ignorance is proof that the City has failed in its duty to train and/or supervise its employee or adopt policies in this regard.  In response, the City has proffered no evidence to suggest that Sergeant

Williams was ever disciplined, reprimanded or subjected to any adverse employment action as a result of the incident.  Nor has it tendered any evidence to indicate that Sergeant Williams was ever required to undergo any training subsequent to the incident. In fact, the evidence in the record appears to insinuate that Sergeant Williams received a promotion subsequent to the incident and serves as a weapons coordinator for the Tomball Police Department.

Evidence of this nature tends to imply that the City may have affirmatively acquiesced in, adopted and/or sanctioned Sergeant Williams' conduct and failed to actively enforce its own policies and procedures.  It also tends to suggest that it and/or other policymakers found no inadequacies in Sergeant Williams' level of training as it continued to permit him to train other officers without requiring any admission of error. Such affirmative official action lends itself to the possibility of recurring situations that present the potential for constitutional rights' violations.  In light of the demanding strictures applicable to the City's motion and because the nature of the consequences imposed by the City with regard to Sergeant Williams' actions relative to the incident remain unclear, the Court determines that fact issues exist sufficient to preclude summary judgment on the plaintiff's § 1983 claim premised on the City's failure to train, supervise and adopt policies.

### E.    The Plaintiff's State Law Claim of Negligence Against the City

The City also moves for summary judgment on the plaintiff's state law claim against it, contending that it enjoys immunity and that the claim alleged against it is not authorized by the Texas Tort Claims Act ("TTCA").  Texas state law provides a limited waiver of sovereign immunity under the TTCA.  As one court has succinctly explained:

> Under the doctrine of sovereign immunity, a governmental unit is not liable for the torts of its officers or agents in the absence of a constitutional or statutory provision creating such liability. *State v. Terrell*, 588 S.W.2d 784, 785 (Tex. 1979). The Texas Tort Claims Act ("TTCA") creates a limited waiver of sovereign immunity. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon 1997). In order for immunity to be waived under the TTCA, the claim must arise under one of the three specific areas of liability for which immunity is waived, and the claim must not fall under one of the exceptions from waiver. *Alvarado v. City of Brownsville*, 865 S.W.2d 148, 155 (Tex. App.--Corpus Christi 1993), rev'd on other grounds, 897 S.W.2d 750 (Tex. 1995). The three specific areas of liability for which immunity has been waived are: (1) injury caused by an employee's use of a motor-driven vehicle; (2) injury caused by a condition or use of tangible personal or real property; and (3) claims arising from premise defects. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon 1997). However, the waiver of immunity does not extend to claims arising out of intentional torts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 (Vernon 1997).

*Medrano v. City of Pearsall*, 989 S.W.2d 141, 143-44 (Tex. App.—San Antonio 1999, no pet.). Here, there is no confusion that the City is a governmental unit to which governmental immunity applies; however, as explained, the TTCA waives immunity, but only to the extent specified by the Act. With respect to the plaintiff's negligence cause of action against the City, the Court finds that he has alleged sufficient facts showing that his injury either resulted from or was "caused by a condition or use of tangible personal" property. TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2) (Vernon 2007). Specifically, the plaintiff contends that his injury resulted from the improper use of or handling of a firearm as part of an overall sequence of improper acts or omissions taken by Sergeant Williams in the course and scope of his employment.

The City, nevertheless, contends that even if Sergeant Williams' acts or omissions escalated to the level of negligent conduct as alleged by the plaintiff, the plaintiff's negligence claim still fails because the record refutes the plaintiff's contention that Sergeant Williams acted *recklessly*. The City argues that despite overcoming §

101.021(2)'s hurdle, a governmental unit retains its immunity from suit if one of the exceptions to waiver applies.  In this regard, the City points to § 101.055(2), an exception to the waiver, which preserves a governmental unit's immunity on a claim arising from the action of a government employee while responding to an emergency call or reacting to an emergency situation unless the action is taken with conscious indifference or reckless disregard for the safety of others.  TEX. CIV. PRAC. & REM. CODE ANN. § 101.055(2) (Vernon 2007).  In such an instance, liability is waived only if the operator acted recklessly, that is, committed an act that the operator knew or should have known posed a high degree of risk of serious injury.  *City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1998).

The summary judgment evidence which revealed a genuine issue of material fact as to whether Sergeant Williams discharged his weapon intentionally also creates a genuine issue of material fact as to whether he acted recklessly in responding to the report of the stolen vehicle.  For this reason, summary judgment as to the plaintiff's state law negligence claim against the City is DENIED.

## VI.   CONCLUSION

Based on the foregoing discussion, the Court hereby GRANTS the City's motion for summary judgment on the plaintiff's § 1983 claims premised on violations of the Fifth, Eighth, and Fourteenth Amendments and DENIES the City's motion for summary judgment on the plaintiff's § 1983 claims premised on an excessive force violation of the Fourth Amendment and the City's failure to train, supervise and adopt policies.  The City's motion for summary judgment is also DENIED as to the plaintiff's claim for negligence under the TTCA.

IT IS SO ORDERED.

SIGNED at Houston, Texas this 4th day of September, 2009.

_____

Kenneth M. Hoyt
United States District Judge